## The Edwin I. Morrison.[1]

### Bradley Fertilizer Co. *v.* The Edwin I. Morrison.

*(District Court, S. D. New York. March 30, 1886.)*

CARRIER OF GOODS BY VESSEL—UNSEAWORTHINESS—PERILS OF THE SEA—DAMAGE TO CARGO—PUMP-HOLE—TAKING IN WATER—INSECURE FASTENINGS—NEGLIGENCE.

The schooner M., while on a voyage down the coast, deeply loaded, in the winter season, was discovered to be making water rapidly. When the crew were about to take to the boats, it was discovered that the water was being taken in through one of the bilge pump holes, the cap of which had come off. The proof showed articles washed about the deck. On the hole being covered, the vessel was pumped free, but the cargo had been damaged by the water taken aboard, and this suit was brought for such damage. The vessel had been in constant use for some 11 years, in all weathers. There had never before been any accident from these pump-holes. It appeared that the cap of the pump-hole had never been unscrewed, or its fastenings tested, for several years at the least. *Held*, that the cap was carried away on account of the weakness of its fastenings, and not from any extraordinary contingency; and that while there was no reason to charge the vessel with any defect in her original construction with such pump-holes, she was bound, before starting at this season, so deeply loaded, to have seen to it that the plates and caps were secure against ordinary accidents, and she was liable for damage to her cargo caused by her neglect to do so.

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

In Admiralty.
*Scudder & Carter*, for libelants.
*Wilcox, Adams & Macklin*, for claimant.

BROWN, J. The libel in this case was filed against the schooner Edwin I. Morrison to recover for the damage done to a cargo of guano by sea-water taken aboard on the tenth day of January, 1884, on her voyage from Boston to Savannah. The schooner sailed on the fifth of January, and, according to her log, on the afternoon of the ninth of January met a very strong gale and heavy sea, and shipped great quantities of water. The 10th opened with a strong westerly gale, sea running very high. "At 8 A. M.," as the log continues, "set two reef foresail and *storm trysail, and hove vessel to, heading about south*. Found that the vessel is making water faster than we can pump her out with both pumps, *the men not being able to work at pumping steadily because of heavy seas sweeping her decks*. Sounded pumps, and found that she has *seven* feet of water in the hold. Cut the boat lashings, and got all ready to leave vessel, when found that the cap had washed off the bilge pump hole on the port side. Nailed a piece of sheet lead over it, and started both pumps agoing. Pumped two hours, and sounded again, and found that we are freeing her very rapidly." The words above quoted in italics have been added to the log at some time since the original entry. The figure "7" is written over an erasure. The damage sued for was occasioned by the flooding of the hold.

The evidence leaves no doubt that most of the water was taken in through the bilge pump hole referred to in the above extract from the log. This was a hole on the port side, in the water-ways, a short distance only in front of the poop, and ran down through the water-way between the ceiling and the skin of the ship. There was a similar hole on the starboard side. They were placed there in the construction of the ship for the purpose of running a hose down in the bilges so as to pump out the water more thoroughly in case of a light cargo and much rolling. The hole was from three to four inches in diameter, and was covered by a brass plate about four inches square, countersunk into the timber, through which was a hole covered by a brass cap which screwed into the plate. The plate was fastened into the water-ways by screws. Such bilge pump holes are not unusual in vessels constructed in some localities, and seldom have any accidents arisen from them. The mode of covering them above described was deemed perfectly secure. Such caps usually project a little above the surface of the water-way, the upper edge of the cap being beveled off so as to leave usually not more than an eighth of an inch of perpendicular surface. The only question in this case is whether, considering all the circumstances, any negligence is shown either in the handling of the ship, or in the sufficiency of her equipment as a seaworthy vessel, as respects the proper security of this port cap and plate.

The schooner was built some 11 years previous. These holes had never been used. They were dangerous unless the caps and plates to cover them were kept perfectly tight and secure. The obligation to keep watch of their condition was as stringent as the danger from weakness in them was extreme; yet there is no satisfactory evidence that there had been more than a casual examination of them since the schooner was built. The evidence shows that up to about half past 4 A. M. of the 10th the schooner had made no more water than was speedily pumped out in the ordinary handling of the pumps every two hours. Upon renewing the pumping at half past 4, and not obtaining a suck as soon as usual, the captain, at 5 A. M., sounded and found 18 inches of water in the hold. The schooner at that time, according to the captain's testimony, was on the port tack, lying to. In order to man the pumps better she was then put before the wind, with the wind on the starboard quarter, which gave her a list to port of about two streaks. Notwithstanding the constant pumping, she continued settling till 9 o'clock, when seven feet of water was found in the hold. The captain supposed she had sprung a leak, probably through her bow ports. About 11 o'clock they wore ship, which presently brought her port side out of water; when, through the gurgling in the bilge pump hole, the second mate discovered the opening, as the master and crew were on the point of abandoning her. The opening was soon covered with sheet lead, and shortly after the ship was speedily lightened by the use of the pumps. The second mate, who took charge of the watch at half past 4, says that she was then on the starboard tack; but he also says her booms were on the starboard side, and that the port side was lowest in the water, and that it was 8 o'clock when they kept her off on the same tack.

The theory of the defense is that the plate and cap were perfectly tight; but that, through the many seas taken aboard and the washing about of many articles upon the deck, particularly of the heavy covers of the chain lockers that had got adrift, the bilge plate and cover, though perfectly sound and tight in their setting, were knocked off by violence or some accidental blow of the floating articles. For the libelants it is urged that this explanation is purely hypothetical, and not entitled to be accepted as a discharge of the ship's presumptive liability.

1. I do not find any reason to charge the ship with any defect in her original construction by reason of having the bilge pump holes. The fact that they were quite commonly used in the construction of such vessels, and deemed safe; that this schooner had been in constant use during all weathers for some 11 years without any previous accident from them; that the existence of these holes was obvious upon any careful inspection or survey of the schooner; and that no objection has ever been made to them,—are a sufficient answer to any charge of unseaworthiness from the mere fact of having such holes. It is, doubtless, possible that if one of the heavy chain locker

covers had been swept violently across the deck in an exactly level position, and with a sharp and hard edge had hit the upright surface of the cap, that might have torn off the cap and plate, and account for this accident. The probabilities of any such contact of a sharp and solid edge of one of these covers in the exact position to do this are exceedingly small. The cap and plate were upon the water-ways, and a number of inches above the deck. The second mate says the covers were "water-logged." They would hardly seem capable of inflicting any blow that would not slide off and over the beveled edge of the cap, if the cap and plate were securely fastened. It seems incredible, moreover, that any such blow could have been given that would not have left its marks upon the stanchions and bulwarks on the port side, which were within a few inches of the plate; yet no such marks appear, nor was anything broken or carried away in that vicinity except the cap and plate, although on the starboard side the bulwarks were in some places carried away. There is, in fact, no evidence of any such violent blow in the region of the cap and plate as is assumed by the claimant. Several experts, moreover, express the opinion that if the plate had been carried away by such a blow, the wood, if sound, would have retained the screws, and their heads would have been broken off, although other experts express a contrary opinion. The screws, however, were carried away with the plate. For the claimants one witness testified that the holes of the screws were sound, and not decayed or blackened; and the fact that the wood held the sheet lead afterwards nailed upon it is urged as evidence that the wood was sound. Other witnesses also testify to the fact that it was sound.

The question is entirely one of probability as to the cause of the plates' coming off. If there was evidence that the plate had been knocked off by some violent blow from objects washed by the seas across the deck, it would still be incumbent upon the claimants to satisfy the court that the cap and plate were so made and so fastened as not to be liable to be knocked off by any ordinary collisions of that kind. The claimant did not introduce any proof by exact measurements to show what was the height of the cap above the water-ways, or the height of the perpendicular edge up to the beveling, nor was the duplicate cap on the starboard side produced. Only some models and samples of what is usual were exhibited. From the evidence, it must be inferred that for several years past, at least, if not ever since the schooner was finished, the cap had not been unscrewed, nor the fastenings of the plate tested.

The schooner on this voyage was also loaded deep, as the evidence clearly shows. The second mate so states explicitly. She may not have been loaded so deep as to be unseaworthy in this respect, but she was loaded deeper than is usual or prudent for the winter season. She was a stanch vessel, and her behavior and recovery, notwithstanding she was on the verge of sinking, are good evidence as to her

generally stanch character and good handling. But being deeply loaded, and sailing down the coast in the winter season, it was to be expected that she would encounter storms, and that her decks would all the more from her deep loading be swept by heavy seas. Before starting out thus deeply loaded she was bound to have seen that the plates and caps in her water-ways were all fast and secure against ordinary accidents or collisions that might come from loose objects swept by the seas across her decks.

The testimony on behalf of the vessel, at the trial, I must deem somewhat exaggerated, both as to the severity of the gales she met, and as to the amount of water on deck prior to the time when the leak became serious. After the leak increased rapidly she necessarily settled gradually lower in the water, and consequently was much more swept by the seas. It is noticeable that although the log says that the vessel on the 9th was laboring heavily, and shipped great quantities of water, this is not stated to have been the case on the 10th until after 8 A. M., several hours after this heavy leak began, although it is said the sea was running very high. The captain's statement, moreover, that the vessel was on the port tack through the night would not make very probable a list to port before the cap was knocked off, and before the water got into the hold. His testimony in the various places where this subject is spoken of leaves it doubtful whether she had any list to port before she was headed off to run free, after 18 inches of water had been discovered at 5 o'clock; and the cap must have got off before that time. The second mate testifies that all the places where the bulwarks were carried away were "on the starboard side; that is, the weather side." He says that about 5 o'clock he picked up one of the chain locker covers close to the poop, where it had been washed, within about two feet of the port cap; but as this was, as he said, a little after daylight, it must have been nearer 6 o'clock than 5. This cover he says was of wood, and water-logged. If so, its edges would scarcely be sufficiently hard to knock off a plate properly secured, having only from one to two eighths of an inch of perpendicular surface.

There can scarcely be any doubt that the cap and plate were carried off through the action of the sea and the things washed about the deck; but the evidence indicates pretty clearly that this was done before the vessel was subjected to any extraordinary conditions, aside from her deep loading; and it is certain that there was no indication of any special violence about the wood-work in that quarter, such as would be necessary to knock away such a cap if properly secured. I think that the only reasonable conclusion is that, after 11 years' service, the fastenings had become weak, and that the plate was carried away from that cause, and not from any extraordinary contingencies. The fact that the starboard plate was still secure does not prove that the port plate might not have become loose or weak. There had been no careful inspection for a long time to make sure of its safety and

strength. Its insufficiency, though latent, was legally at the risk of the vessel. *Work* v. *Leathers*, 97 U. S. 379; *Wilson* v. *Griswold*, 9 Blatchf. 267; *Hubert* v. *Recknagel*, 13 Fed. Rep. 912; *The Lillie Hamilton*, 18 Fed. Rep. 327.

In the case of *The Titania*, 19 Fed. Rep. 101, there was no long lapse of time during which the original fastenings might naturally have become weak. The fastening and the careful inspection were recent. Here the contrary is the fact.

To be ascribed to a peril of the seas, the burden of proof is upon the vessel to show that the plate and cap were probably carried away by extraordinary contingencies not reasonably to be anticipated. The evidence does not, in my judgment, disclose any such extraordinary condition of things at the early hour of 4:30 to 5 A. M. of the 10th, considering the time of the year and the depth of loading under which the vessel set sail. It does not appear that she lost a spar or a bit of canvass, although there was doubtless a long continuation of heavy weather. The improbability that any of the supposed causes should have carried away the plate, if it had been properly secured at the time of sailing, without doing any other damage to the bulwarks or stanchions adjacent, I deem so great that I feel constrained to ascribe the cause, in the absence of proof of any thorough trial or inspection of the plate before the schooner sailed, to the gradual weakening of the fastenings during the 11 years since the vessel was built.

Fully appreciating the uncertainty and embarrassment that attend the case, I must allow judgment for the libelant, and direct an order for reference to compute the damages.